Well, first, for what is likely the most enjoyable part of the morning, I turn to Judge Moore for a motion. I would like to move the admission of my law clerk. Please stand up, Reba. I move the admission of Rebecca L. Ravenstein, who is a member of the bar and is in good standing with the highest court of New York. I have knowledge of her credentials. I'm satisfied she possesses the necessary qualifications. Reba has been my clerk for more than a year. She came to me from a firm life, many years of experience, a PhD in chemistry, and she has been a joy to work with for me and all of her co-clerks, as well as brought a wealth of knowledge and experience to my chambers. So I've been very fortunate to have her. I have no doubt that she's going to make an excellent new member of our bar. So, Reba, if my motion is granted, I'll ask you to turn to the Admiral. Is it granted? Yes. OK, very good. Great question. If you solemnly swear, you will report yourself as an attorney and counsel of this court, uprightly and according to the law, that you will support the Constitution of the United States of America. I do. Congratulations. Welcome to the bar. Congratulations. Welcome to the bar. All right. First case this morning is 15-1570, Rapid Litigation Management v. Sells Direct, Incorporated. Mr. Pintus, whenever you're ready. Thank you, Your Honor, and may it please the Court. The question in this case is whether the 929 patent is invalid under Section 101 on the ground that it's directed to a law of nature. Our submission is that it qualifies as patentable under both steps of the Mayo Alice analysis. Turning first to Step 1, this patent is fundamentally different from the ones at issue in Mayo and Sequinon. Those patents were directed to a phenomenon occurring in nature that the inventor had observed, and they claimed processes to detect the naturally occurring phenomena and to explain the consequences of it. But I think among the things that your friend on the other side would say is this capacity for the cells to survive the second freezing is really an inherent property, and therefore it falls under Mayo, Myriad, et cetera. Why is that wrong? I think that proves too much, Your Honor, because anything that non-natural human treatment of naturally occurring objects, the results of that non-natural treatment is according to a natural law by definition. When iron ore is placed in a high temperature and carbon is added, steel is produced. That's all as a result of natural laws, but no one would say that that's not a patentable process. So I think there's a fundamental difference between a patent that's directed to observing something that occurs in nature and one that's directed to not detecting something that occurs naturally but employing processes that do not occur in nature, which is what happens here. There's no multiple freezing in nature. So if we had a claim that took the isolated DNA of Myriad and said we're freezing that, that's the method claim, would that be patentable in your view? Would the Supreme Court think that would have made it patentable? Well, I think there are two things that happen here. One is subjecting it to a non-natural process. The second is that the product is something that doesn't occur in nature. Here, the frozen collection of multiple pooled cells that has a longer shelf life and that is useful. So I think to some extent the inquiries under Step 1 and Step 2 merge, but I think our submission under Step 1 is that if that discovery or subjecting that naturally occurring object to a non-natural process yields something that doesn't occur in nature, then yes, that would be satisfied. But the Supreme Court dealt with this in Myriad already. I don't even understand why you're hinging your argument on this. I don't think you need it in order to prevail given that these are method claims. And I thought, aren't these claims just directed to a method of preserving cells by freezing them in an environment where the prior art suggested very much not to do that? Isn't this just a method of preservation? And if so, why isn't it necessarily patent eligible for that reason? Why do you need to make all this argument about the hepatocyte cells and whether they're found in nature or not? Well, I think we have a very strong argument under Step 2 of the approach, as Your Honor suggests, because as this Court observed in its prior decision in this case. No, this is not Step 2. My point is that under Myriad where the Supreme Court went extensively to lengths to say we're not addressing method claims here. And they made it very, very clear. It's important to note what is not implicated by this decision. There are no method claims before this Court. That's what they said. These are a method of preserving cells, right? Absolutely. Isn't that what this claim is directed to? Absolutely. How can any claim directed to a method of preserving cells be patent ineligible? Well, we're very happy to agree with Your Honor on that, absolutely on that point. There have been some thought in some of the cases that the type of patent, method versus not, wasn't dispositive. Well, because Prometheus was a method claim, but that's different. It was a method of detecting an inherent trait. This isn't a method of detecting anything about their survivability in frozen. It's a method of actually freezing them and then having a group of usable cells afterwards. That is exactly the point that I was making, probably not as clearly as Your Honor, that Prometheus was about detection. And this is about a method of acting upon the cells to put them in a different state and that that's fundamentally different because it's subjecting them to this non-natural process. Okay, stop. See, this is where you've lost me. You're again going into the argument which I will not agree with you on because Myriad has foreclosed it. When you extract and isolate DNA, you have done something to remove it from its naturally occurring state. Just like when you freeze these cells, you've done something to remove them from their naturally occurring state, but that doesn't change their underlying nature according to the Supreme Court and make them patent eligible. So I don't know that you could get me to go with you on the cells if these were cell claims. And we're not trying to. They're not. No, we're not trying to. And we're very happy to rest on the fact that this is a method and it is not a method for detection and that takes it out of Mayo. And we think for that reason, we pass muster under step one. And if there was any doubt about that, turning to step two, we think that the process is anything, it certainly doesn't meet the quite low standard of conventional or routine or industry standard. This is something that as the court observed. What if we thought this was construed as being a product by process claim? Would that change the analysis, the difference between that, construing it as that versus a method claim? Well, I think it clearly is a method claim, but I think the fact that we are not, I think then we would have to put more weight on where Judge Moore doesn't want to go and to look at what's going on here. And I think we would still say that what comes out at the end is something that is different. But I don't think the court has to go there because this is quite clearly a method claim. You mentioned multi-pulled earlier and when you were describing the claims. Is that in claim one or is that really in claim five? Yes. Okay. So just to elaborate on the step two point, I think even if we somehow were to flunk step one, we don't think we do for the reasons we've discussed. But step two requires only something that's not conventional and not routine and we think we have that here. The district court, we think, made a couple of errors in law in applying that test. First of all, it set the bar too high. It seemed to set the bar much closer to novelty. Second of all, it didn't evaluate the steps as a group. It dissected them. Just to be curious, you started by saying they made a couple of errors of law. Aren't these factual questions, not legal questions? So wouldn't these be problematic under... Aren't these facts? Isn't whether or not cryo-preserving is a non-obvious step to a factual question or shouldn't it be? Have we necessarily resolved that it's a question of law? I don't think the court has necessarily resolved it. We think it's an ultimate question of law. But even if it weren't an ultimate question of law... So you mean the 101 question is ultimately a question of law? Yes. Or do you mean whether or not cryo-preserving adds a non-novel element to the claim? Do you think that's a question of law? I think it's probably a mixed question of law and fact, Your Honor. I think there obviously are subsidiary questions that are wholly factual. What was the prior art? What was the teaching? But I think ultimately... Because novelty, you know novelty, anticipation is itself a question of fact, right? So if I'm looking at this claim to see if any of the elements add a novel aspect, why wouldn't that be a question of fact? Well, a couple of things. I don't want to quarrel too much with the underlying point of Your Honor's question, but I think it's important to recognize, and I think this is a case where the court could make clear, that the step two inquiry here is not anticipation or novelty. It's something that puts much less of a burden on the patentee. Can I ask you just a general question about what's going on in this litigation? Because this was previously the subject of a preliminary injunction, right? What's the status of the... So the injunction has been dissolved, presumably. Well, the defendant has designed around the injunction, and that design around has been held not to infringe the patent. So what remains of this litigation? There are damages. There's retrospective liability. And all of the other validity challenges have been disposed of? No, they haven't been addressed. This is where we are in the litigation. Am I correct in understanding that the design around was with respect to the density gradient fractionization? Yes, Your Honor, it's with respect to that. But just turning back to step two, I think there certainly are legal questions, whether the ultimate question is one of fact or law, or mixed question of fact or law, on whether the steps are conventional or routine or not. There certainly are a couple of questions. First of all, what is the standard for non-conventional and non-routine? We think it's, as I said, a low standard. It's basically, is there something other than the industry, something that was standard in the industry here? There's a legal question about whether, as the district court did, you look at the steps one by one and dissect them, or whether, as Deere says, you have to look at them as a group. We think that's a legal question. And the district court also seemed to take the position that a step was conventional if it turned on something that was the result of an act of nature, the results of freezing. That can't possibly be right, because that would mean that no step in this area, where everything depends on the consequences of a law of nature in a non-natural environment, that can't possibly be right. And finally, there has to be something in the record. The district court here seemed to really make a sort of a decision on, gee, this seems conventional, without looking at the facts in terms of the prior art and other factual evidence. And that seems clearly wrong. Okay. Why don't we hear from the other side? Thank you. Thank you. Mr. Mangum, good morning. Good morning. May it please the Court, David Mangum for SalesDirect. The 929 patent claims here are ineligible under the two-part Mayo analysis test because they are directed to a law of nature, a phenomenon of nature, the natural ability of some hepatocyte cells to survive multiple freeze-thaw cycles. But what's happening here is through the intervention of a person, right?  Correct. But also in Mayo, the application required the intervention of a human to prescribe and provide the drug, and then the reaction that took place within the body was the natural reaction here. And really here, the claims themselves call out a natural phenomenon. Cells don't, by themselves, live indefinitely. They're not viable indefinitely in the absence of this method being performed on them, right? They do not necessarily are cryopreserved, and then when they are used, of course, they are then thawed and put back in and perform in exactly the same way they did before. And I would submit that this claim is directed to detection just the same way as the claims in Myriad. What you have here is detecting the ability of these cells, the ones that are capable of being frozen and thawed multiple times. In Myriad and in Sequinon, you detect the presence by amplifying the number of cells, so there's a multiplication process. Here, you detect those cells that are capable of surviving the multiple freeze-thaw cycle through subtraction. You isolate the ones that are capable of surviving from those that aren't capable of surviving, and therefore detect their presence. And what's claimed here is expressly a method of producing a desired preparation of multi-cryopreserved hepatocytes, said hepatocytes being capable of being frozen and thawed at least two times. So I think what would distinguish this patent and this claim from others is that right in the patent itself, you call out the natural phenomenon, the ability, the capability of a subpopulation of these cells to survive multiple freeze-thaw cycles is expressly stated in the claim. Now, it may very well be that someone could draft a claim for processes, including processes of cryopreservation, that would survive a 101 analysis. But here, the way this claim is drafted, it expressly calls out the very law of nature, the very natural phenomenon that is precluded by 101. How do you respond to the point made in Bio's brief that these cells aren't frozen twice in nature? That's not something that occurs naturally. Well, and DNA is not subjected to high temperatures to break their covalent bonds and then spliced in to create primers with regard to that. But that wasn't a method claim. And as Judge Moore pointed out, that is not a method. That case did not involve a method claim. And here, you've got a method claim with a very specific process where even one of the steps has been able to be designed around. Right. But the process itself is directed at detecting, just as in Mayo and just as in Ariosa and Sequenom, detecting the presence, detecting the capability of these cells to survive multiple freeze-thaw cycles. And just as in Sequenom... I thought it was producing, not detecting. Well, yes, but you're producing a preparation that consists of the subpopulation of cells that are capable of surviving multiple freeze-thaw cycles. So I submit that it's equivalent to identifying, if you will, those cells that are capable of surviving the multiple freeze-thaw cycle. And then you are now isolating those cells that are capable of surviving from those that aren't capable of surviving. And now you are continuing on with a product that consists entirely of cells that exist exactly like they did in nature. They have the same properties. So the individual cells exist like they did in nature, even if the collection as a whole didn't exist as it did in nature. Well, all of the cells that end up in the ultimate product also existed at the start. There's no replication, amplification of those. Even for CLAIM-5? Well, for CLAIM-5, yes, all of those cells started at the front. All you've done in CLAIM-5 is put together cells that came from different donor livers together in the same preparation. So just as in Funk Brothers, what you end up with is a combination of those individual cells that exist in nature. And they operate exactly the way that they did in nature once you apply them. But you would agree that there are different methods by which you could achieve that? I mean, it is a methaclaim. And the steps in the methaclaim need not be followed in order to produce the twice-preserved hepatocytes that you end up with. Well, if I understand Your Honor's question, there may be alternative methods that you could use at different steps in terms of cell separation, but these claims purport to cover every aspect of which you could perform a second-trial preservation. There's no limitation with regard to the step that applies the natural phenomenon here. You take these cells, and any way that you subject them to a second-trial preservation... But you have to look at all the steps as a whole, right? Correct. And do I understand correctly that your client no longer performs Step A? Well, yes. My client uses a different technique for cell separation and doesn't require the density of the cell to distinguish between them. But in terms of what's preempted here and in terms of its application, I think you have to look at the aspect of the claim that deals with the natural phenomenon at issue. So you wouldn't look at the entire claim? You look at the entire claim... To see what's preempted by the claim? You look at the entire claim to determine its application and for determining infringement. But with regard to this process, this method, this method purport to cover, in terms of the trial preservation step, any type of trial preservation that's performed on these cells that have been subjected to a prior freeze-thaw, and then after you have identified those that are capable of surviving the second freeze-thaw cycle. So just as in Ariosa and Sequinon, the process here begins and ends with a product of nature, a natural phenomenon. And because of that, it's directed to it. And in fact, it expressly calls out here the natural phenomenon. Myriad, I read from it before when it says, it's important to know what is not implicated by this decision versus there are no method claims before this court. The next sentence is even more interesting. How will you contend with this? Because it goes on to say, had Myriad created an innovative method for manipulating the genes while searching for BRCA1, it could possibly have sought a method patent. Why isn't this an innovative method of manipulating the hepatocyte cells? Well, it's admitted in this record that the process of separating the viable cells from the non-viable cells is conventional and well understood. And here, the only aspect of this method that is new is the application of a conventional cryopreservation step using conventional methods. That's two cells that had been previously frozen. Except that while the notion of cryopreservation is absolutely conventional, it was counter-indicated with regard to hepatocyte cells because they didn't generally survive. And so here we have this method of separating out the ones most likely to survive and subjecting them to these multiple freezes. I guess freezing them first, separating out the ones most likely to survive, freezing them again. So they've come up with an innovative way of selecting from the pool of all hepatocyte cells those cells likely to be able to survive cryopreservation. Why isn't that innovative in light of the state-of-the-art? Well, I think what the response is, all that they are doing is identifying those cells which exhibit the natural phenomenon. You say, all they're doing is identifying. No, no, they're actually submitting them. They're freezing them. They're thawing them, submitting them to a density gradient. Then they're separating them. Then they're freezing them again. That's what these steps are. Correct. These steps have nothing to do with identification. It has to do with a series of steps being performed and a winnowing of cells in that process. But I don't see why this is an identification point. Well, you are isolating the ones that exhibit the natural phenomenon of being able to survive multiple freeze-thaw cycles. So you're taking those and then... And then freezing them, though. Yeah, subjecting them to it, which is coextensive with the natural phenomenon that you're claiming. You say, I'm going to start with a group of cells, some of which are capable of being frozen and thawed more than once. But if this is your argument, then nobody could ever, even the very first person to have done it, could ever get a method claim on cryopreservation of any cells. Because your argument is that your method of cryopreserving cells, even though it is a method of preservation, is not eligible for patentability because it's acting on underlying cells. If someone came up with a novel approach of cryopreserving hepatocyte cells that was providing an enhanced ability of those cells to survive through the cryopreservation techniques, here it's acknowledged that all of the cryopreservation techniques, that you can use any of them, that they're all conventional, that they're all well understood and routine in the art. The only difference between the cryopreservation steps here and those that had been practiced for 30 years at the time is that you're applying it to cells that have the natural capability of surviving that second freeze process, which is coextensive with the natural phenomenon. It's called out expressly. Is your argument, though, so suppose that I come up with the concept of cryopreservation and I really am the first to have come up with that and I cryopreserve a particular cell line. Is it really your argument then that the next scientist that realizes and has the light bulb go off, oh my goodness, not only can her cryopreservation technique work on these cells, it'll work on all these other cells as well, and that he or she then patents the process of cryopreserving different cell lines, which I had not anticipated. I had not disclosed. I had not thought of. Are they really not entitled to that patent? Well, I don't think that's the case here. Yes, you could. But that is the case here because the argument, it seemed to me, to a large extent boiled down to whether or not it was obvious to cryopreserve the cells based on the likelihood of their survivability. Really what was acknowledged here is that there's a certain number of these cells that's discovered that certain of these cells, and you don't know which ones they are when you start the process, have the capability of surviving multiple freeze-thaw cycles. So what do you do? You take hepatocytes that are isolated from the liver. You subject them to the first freeze, which was a conventional step. You thaw them, which was a conventional step. You perform a density gradient fractionation on them to separate out the cells that survived the first freeze-thaw from those that didn't, conventional step. You can cool those, conventional step. That was being done in the arc. People were making their own pools and then immediately going on to test them in the pharmaceutical industry. The only thing that wasn't done before was taking those cells that had been previously frozen and thawed and then freezing them again, which is the very thing which was the discovered natural phenomenon. You claim and you're talking about patent eligibility. I just don't understand your logic because if these are a series of steps, every method, every series of steps in every method, each of those steps individually has been done by someone before. It's like taking a chemical composition. Every one of the elements that's added preexisted. It's the combination that is new. If this combination is new, these steps were not previously performed in this series in the past, then why isn't it patent eligible? I think the reason is because the way this claim is drafted, this claim specifically calls out the discovered natural phenomenon. You mean the wear-in clause? This claim could have easily stopped before the wear-in clause, where in greater than 70% survived. If this claim had stopped before the wear-in clause, then you think it would be patent eligible, but because it actually has the wear-in clause, you think it's not? The claim itself, right in the preamble, says that it's a method of producing this preparation, said hepatocytes being capable of being frozen and thawed at least two times. That's just a method of intended purpose for these method steps. The only thing in the body of the claim, it seems to me, that goes to the natural phenomenon that you're claiming is the wear-in clause. Wear-in greater than 70% are viable after the first thaw. Nothing else in the body of the claim supports what you're saying. In the body of the claim in Step C that you're pointing to, Judge Moore, it talks about said hepatocytes. So there is express reference that the antecedent basis for the said hepatocytes is the statement in the preamble. Why isn't it the statement in Part A? In Part A, subjecting hepatocytes. The said hepatocytes in C gets its antecedent basis from A, not from the preamble. In terms of the wear-in clause in reference to its ability to survive, it's coming from the capability of those hepatocytes to survive multiple freeze-thaw cycles. I see I've exhausted my time. Is there more follow-up? Thank you. Just a couple of brief points, Your Honor. My colleague referred to Funk Brothers, but there too the Supreme Court expressly said that it wasn't dealing with a method patent. And also relevant to the Step 2 analysis, if the Court reaches it, said that it was a simple step to mix the various naturally occurring substances and here, as we've discussed, our contention is that the steps here are not industry standard or routine for the reasons that the Court has pointed out and that I've discussed. In response to Judge Stoll's question, I think what exists in nature is individual hepatocytes from individual separate donors that have a very short lifespan. And what this method is designed to do, as Judge Moore said, is to both preserve them but also to provide a mechanism by which they can be pooled because in nature it is rare that there are multiple donors available at the same time to create initially a pooled sample. So what happens here is after the first freeze, when they are thawed, then it is possible to mix them together from different donors and have something at the end that not only is preserved but also has this characteristic of being a group of cells from different donors. And does that have advantages? That has significant advantages for the testing process as the patent plays out. And no combination of cells from different donors would exist in nature? It wouldn't. So even if I had a problem with your Claim 1 argument, vis-à-vis the cells themselves and the myriad point I made, you would distinguish that Claim 5, on the other hand, creates a composition of cells that absolutely is not found in nature? Absolutely, Your Honor. Okay. I just want to make sure I understand. Unless the court has any further questions. We thank both counsel. The case is submitted.